OPINION OF THE COURT
Lewis R. Friedman, J.
After years of study, passage of several bills by the House of Representatives and extensive hearings, in 1988 Congress adopted the Employee Polygraph Protection Act (EPPA or the Act) (29 USC § 2001 et seq., Pub L 100-347). The statute as *253 finally enacted was the outgrowth of a series of congressional hearings that claimed that almost 2 million polygraph[1] examinations had been given by private industry in a single year. Allegedly many examiners were untrained. While some commentators had contended that no polygraph examination was valid, many challenged the type of quick tests routinely administered in preemployment settings as grossly inaccurate. There was a substantial outcry about the number of persons branded as untrustworthy by instruments that had not proven their validity.[2] Also, by 1988 New York was one of only seven States that had not adopted some form of regulation of the administration of polygraph examinations (see, Hall v United Parcel Serv. 76 NY2d 27, 34-36 [1990]). Congress sought to impose some degree of uniformity on the patchwork quilt of regulations and to adopt basic rules applicable to the administration of polygraph examinations in the private sector workplace.
Generally speaking the EPPA prohibits private employers from using polygraph tests for preemployment screening or random testing during employment (29 USC § 2002; EPPA § 3). The statute became effective December 27, 1988 and created private rights of action for lost wages, reinstatement and the like that can be brought in either State or Federal court (29 USC § 2005 [c]; EPPA § 6 [c]); however, there are few reported cases in State or Federal courts discussing the statute.[3]
Insofar as relevant here section 3 of the EPPA makes it unlawful for an employer "engaged in or affecting commerce” *254 to "require, request, suggest, or cause any employee * * * to take or submit to any lie detector test” (29 USC § 2002 [1]) or to "discharge, discipline, discriminate against in any manner * * * or threaten to take any such action” against any employee who "refuses, declines, or fails to take or submit to any lie detector test” (29 USC § 2002 [3] [A]). Section 7 of the Act (29 USC § 2006) provides for certain limited exceptions to the absolute bans of section 3. There is only one exception in section 7 available for a private sector employer which is not connected with national security, the manufacture, distribution and dispensing of controlled substances, the provision of security services for certain public facilities, or certain FBI contractors. Under the "Limited exemption for ongoing investigations” a private employer is entitled to administer a polygraph test if the test is given in connection with an "ongoing investigation” (1) "involving economic loss or injury to the employer’s business, such as theft, embezzlement, misappropriation, or an act of unlawful industrial espionage or sabotage;” (2) the employee had access to the property in question; (3) the employer has a "reasonable suspicion” that the employee was involved in the incident under investigation; (4) the employer signs a statement containing certain required information and provides it to the employee at least 48 hours prior to proposed test (29 USC § 2006 [d]).
In this action plaintiff, Dennis Wiltshire, a former employee of Citibank, complains that Citibank violated his rights by asking him to take a polygraph test and discharging him after he refused to take the test; he alleges that Citibank does not come within any of the exceptions. Citibank moves for summary judgment and dismissal of the complaint; plaintiff cross-moves for summary judgment on liability and seeks a trial limited to the issue of damages. Citibank had previously moved to dismiss the action for failure to state a cause of action and because it had "been exonerated” of the violations by the Department of Labor[4] on Wiltshire’s allegations of a violation of the EPPA. Wiltshire had cross-moved for partial summary judgment on the issue of liability, in part based on the Department of Labor findings. On January 21, 1995 Justice Schackman denied both *255 applications finding no privity between plaintiff and the Department of Labor so that the settlement between defendant and that agency should not have any effect on this case.[5] The case has proceeded through discovery and is apparently trial ready.
Wiltshire urges that Citibank has failed to comply with EPPA requirements in that Citibank did not state the basis for its "reasonable suspicion” and the specific "economic loss” to the employer’s business prior to the request that he submit to a polygraph test. Wiltshire claims Citibank cannot show that it has complied with the "ongoing investigation” exception and is, therefore, liable under the Act.
Plaintiff had been a manager and the client services head in Citibank’s global custody department in New York. In December 1990 Citibank learned that there had been a fraudulent wire transfer of $1.5 million which originated in the global custody department. A debit slip with the purported signatures of four Citibank employees was time and date stamped at the global custody department at 11:19 a.m. on December 7, 1990. The funds were transferred to the Bank of New York for the account of a Swiss money broker. After the party trying to pick up the funds had difficulty with identification, a memo amending the original wire transfer was issued on Citibank letterhead and bearing the purported signature of a Citibank assistant vice-president. The Bank of New York became suspicious and contacted authorities at Citibank on December 12. The purported amendment, it appears, had been faxed from the College Board and not Citibank. The funds were eventually returned to Citibank, after payment of $7,500 in legal and other fees to the recipient of the funds.
Citibank and the FBI began an investigation to find the Citibank employee or employees who might have been involved in the fraudulent transfer. It appears that two of the four signatures on the debit memo were forgeries and the signature of alleged "assistant vice-president” on the amendment of the wire transfer was the name of a London employee who had at one time been a vice-president in the global custody department in New York. It also appears that a time stamp on debit memos was neither required nor usual in the global custody department. By February 1991 Citibank learned from the FBI that a confidential informant had told them of a meeting in *256 Brooklyn of the persons planning the fraud. One of the persons at the meeting, a "well-built black male” had described himself as a Citibank manager of Guyanese descent. Citibank interviewed persons at Citibank who were thought to have involvement with the fraud. Citibank’s investigation narrowed to plaintiff as the only person who fit the criteria of knowledge, access, description and connection with an address near the Brooklyn meeting place. Plaintiff was interviewed by the investigators from Citibank. He denied involvement with the fraud. He was, however, the only person interviewed who stated that it was necessary to place a date stamp on a debit ticket to generate a wire transfer from the global custody department. On February 25, 1991 plaintiff was asked to consider taking a polygraph test. Plaintiff was given a "Polygraph Test Information Sheet”, an "Investigation Memorandum”, and a copy of the questions that were to be asked at the polygraph examination. He was given 48 hours to decide whether to take the test. On February 27 plaintiff declined to take the polygraph test and was immediately suspended. The question of his termination was referred to an investigations review board consisting of Citibank vice-presidents. On March 11 the board heard from the bank’s investigating official and determined to terminate plaintiff due to an alleged lack of confidence in plaintiff’s ability to protect Citibank’s interests. According to the depositions of the board members the refusal to take the polygraph test was irrelevant to their decision.[6]
Citibank contends that plaintiff cannot prove his prima facie case because the "uncontested proof’ is that he was fired based on the facts known by the bank unrelated to plaintiff’s refusal to take the polygraph. The court concludes that plaintiff has established his prima facie case once he establishes that he was asked to take a polygraph examination and that adverse employment action followed. The Secretary of Labor has consistently held that a suspension that occurs soon after learning of a test result would "justify an inference that the test result was the likely reason for the suspension” (Matter of Scrivener Oil Co., 91-EPP-6, Secretary of Labor Dec, Apr. 13, 1995 slip op, at 6; Matter of State Empls. Credit Union, 93-EPP-9, Secretary of Labor Dec, Mar. 31, 1995 slip op, at 9-10). The Secretary analogized cases under the EPPA to other employment-related cases such as Couty v Dole (886 F2d 147, *257 148 [8th Cir 1989]), where a sufficient prima facie case is made out through "temporal proximity” between the prohibited conduct and the discharge. "Once [plaintiff] establishes these elements the burden shifts to the employer to produce evidence that the adverse action was not based on the result of the test” (Matter of State Empls. Credit Union, supra, at 10). The court does not see any reason to fault the Secretary’s analysis of the burden on the plaintiff. Here Citibank relies on the self-serving statement of its employees to establish that the review board, before which plaintiff did not appear and which heard a full presentation solely by the bank’s investigator, did not rely on plaintiff’s refusal to take the test. The court on a summary judgment motion may not make the factual determination of the weight to be accorded the determination to suspend plaintiff immediately after he refused to take the test as opposed to the statements of the employees who made the termination decision. That is a question for the jury.
Citibank contends that it has complied with the ongoing investigation exception to the EPPA. The Act does not specify which party has the burden of proof on the issue of the availability of that exception. Common sense and the legislative history, which shows a strong congressional intent to limit the use of polygraphs, lead to the unequivocal conclusion that the burden must be on the employer to show that it "fulfills every one of the requirements set forth in section 2006” (Blackwell v 53rd-Ellis Currency Exch., 852 F Supp 646, 651 [ND Ill 1994]). In Matter of Rapid Roberts, the Secretary of Labor, reversing the ALJ, specifically held that once the employee has shown that he was asked to take a polygraph test "[I]t is the employer’s burden to show that he is an eligible exemptee, as per § 2006” (Matter of Rapid Roberts, 91-EPP-4, Secretary of Labor Dec, May 1, 1995 slip op, at 6).
In order to be exempt under 29 USC § 2006 Citibank must show (1) that it was conducting an ongoing investigation, (2) that there was an "economic loss” to its business, (3) that plaintiff had access to the property in question, (4) that it had reasonable suspicion of plaintiff’s involvement and (5) that it provided plaintiff with the required written statement. There is no doubt that this was an "ongoing investigation”. That is, it was an investigation "of a specific incident or activity”, not a random test (29 CFR 801.12 [b]). The investigation was "ongoing” after Citibank received the information from the FBI as to the involvement of a bank manager (see, Suttle v Dominion Bank, 1993 WL 415691, 8 [Ct App, Tenn, Oct. 13, 1993, Todd, *258 P. J.]). Similarly there is no question that defendant had "access” in the sense that there was "the opportunity which an employee had to cause, or to aid or abet in causing, the specific economic loss or injury under investigation” (29 CFR 801.12 [e] [1]). The remaining elements are in dispute.
Plaintiff asserts that there was no "economic loss” to the bank since the entire $1.5 million was recovered from the ultimate recipient of the funds. The Act refers to "theft, embezzlement, [and] misappropriation” as examples of an "economic loss” (29 USC § 2006 [d] [1]). The loss to Citibank of the $1.5 million by fraudulent means, even for several days, is clearly a direct "economic loss”. Also the facts disclosed on this motion establish that Citibank paid $7,500 for the return of its $1.5 million. That is surely an economic loss, as well. The regulation’s definition of "economic loss” makes it clear that a "direct or indirect” loss is sufficient to trigger the right to use a polygraph. Thus even if the funds did not belong to Citibank, but were only in its custody, there would be an indirect loss by the fraudulent transfer (see, 29 CFR 801.12 [c] [1] [iv]).
The issue of whether there was "reasonable suspicion” for Citibank to believe that plaintiff was involved in the transaction involves many factors. As one commentator has noted this issue " 'may be the most complex issue posed by, and ultimately litigated under the Act’ ” (Cullen, The Specific Incident Exemption of the Employee Polygraph Protection Act: Deceptively Straightforward, 65 Notre Dame L Rev 262, 281 [1990], quoting Fitzpatrick, The Employee Polygraph Protection Act of 1988, 35 Fed B News & J 369 [1988]). As the court held in Blackwell v 53rd-Ellis Currency Exch. (supra, 852 F Supp, at 650), the courts must look to the legislative history to see what the phrase "reasonable suspicion” meant. Congress intended that there be "some observable articulable basis beyond the predicate loss and access required for testing. This could include factors such as the demeanor of the employee or discrepancies which arise during the course of an investigation * * * [T]he totality of [the] circumstances * * * [of] such access * * * may constitute an additional factor.” (See, HR Rep No. 659, 100th Cong, 2d Sess 12, 13, reprinted in 1988 US Code Cong & Admin News 751.) Moreover the standard for reasonable suspicion was not intended to be as stringent as that in search and seizure cases under the criminal law (S Rep No. 284, 100th Cong, 2d Sess 41, 48-59, reprinted in 1988 US Code Cong & Admin News 726, 728, 739-747). The regulations at 29 CFR 801.12 (f) (1) reflect that there must be some basis for belief that the *259 particular employee was involved in or responsible for the economic loss. The Secretary has concluded that the term "reasonable suspicion” was intended to incorporate the same test as used in Terry v Ohio (392 US 1 [1968]) and its progeny (see, Matter of State Empls. Credit Union, supra, at 6). That is "although a less demanding standard than probable cause, the reasonable suspicion test still proceeds from an objective analysis of the fact. United States v Cortez, 449 US 411, 418 (1981). It does not come accompanied by a presumption in favor of the government, nor — in this case — the employer. The reasonable suspicion test does not insulate searches or investigations from close review. Its purpose is to protect employees, rather tha[n] to license employers.” (Matter of State Empls. Credit Union, supra, at 7.) In reversing ALJ decisions the Secretary has held "Employers are not entitled to 'broad deference’ in deciding what constitutes a reasonable suspicion” (Matter of Rapid Roberts, supra, at 6; Matter of State Empls. Credit Union, supra, at 7). "The EPPA is intended to severely restrict the use of lie detector devices by employers. Unless an employer can meet the strict requirements of one of the exemptions, it is barred from using lie detector tests. The exemptions must be narrowly construed to fulfill the purposes of the Act” (Matter of State Empls. Credit Union, supra, at 8). This court has no reason to disagree with the Secretary of Labor, the official designated by Congress to interpret and implement the Act (cf., Bingler v Johnson, 394 US 741, 750; Richards v Richards, 167 Misc 2d 392, 395, affd 232 AD2d 303). The agency’s interpretation should be followed "unless it runs counter to the clear wording of a statutory provision” (Matter of New York Pub. Interest Research Group v New York State Dept. of Ins., 66 NY2d 444, 448).
In the case at bar the employer has amply demonstrated that it had a "reasonable suspicion” that Mr. Wiltshire was involved in the fraudulent transfer, based on the objective facts. He alone of all the bank’s employees asserted that a date stamp, which appeared on the forged document, was necessary for a wire transfer, while it was not. He had access since he was employed in the physical location at the bank, and in the department, which issued the wire transfers. He also fit the physical description of the individual the FBI informant had stated had said was a manager at Citibank. He was the only one employed in the section who was from Guyana and the employer was told that there was an individual from Guyana involved. Obviously the bank had a right to rely on the ac *260 curacy of the information given it by the FBI. The totality of the circumstances pointed to plaintiff. Citibank has demonstrated that it had "reasonable suspicion” of plaintiff’s involvement with the fraud.
Plaintiff contends that the written notice given to him was fatally defective. The Act requires that prior to any request for a polygraph test an employee be given a written statement which "sets forth with particularity the specific incident or activity being investigated and the basis for testing particular employees” (29 USC § 2006 [d] [4] [A]). In addition to an appropriate signature and proper retention of the statement (29 USC § 2006 [d] [4] [B], [C]) it must contain
"at a minimum—
"(i) an identification of the specific economic loss or injury to the business of the employer,
"(ii) a statement indicating that the employee had access to the property that is the subject of the investigation, and
"(iii) a statement describing the basis of the employer’s reasonable suspicion that the employee was involved in the incident or activity under investigation” (29 USC § 2006 [d] [4] [D]).
The regulations make it clear that the burden is on the employer to provide sufficient "particularity” in the written notice, and that the notice be "in a language understood by the [employee]” (29 CFR 801.12 [a] [4]). "If the basis for an employer’s requesting an employee (or employees) to take a polygraph test is not articulated with particularity, and reduced to writing, then the standard is not met” (29 CFR 801.12 [g] [3]).
Plaintiff asserts that the investigation memorandum given to him failed to specify the economic loss and the reasonable suspicion. The document specified the transactions under investigation including the amount, date and that Mr. Wilt-shire was present when the documents were sent. In the written statement Citibank described that the incident involved a $1.5 million fraudulent wire transfer but wrote "none” with respect to no economic loss or injury to the bank. Of course, this was true in the sense that the bank had been able to recover its $1.5 million, although its wire transfer system was compromised and it lost the use of its funds for a time and had to pay substantial expenses to recover its funds. As required by 29 USC § 2007 (b) (2) (E) coupled with the investigation memorandum was a list of questions which Citibank anticipated *261 would be asked of Mr. Wiltshire during a polygraph examination, including inquiries into details about the transaction under investigation. Both the memo and questions were signed by Mr. Wiltshire on February 25, 1991. The court finds that reading the two documents together there is sufficient compliance with 29 USC § 2006 (d) (4) (D) (i)’s requirement that the "economic loss” to Citibank be identified. It is only reasonable to read the documents presented to plaintiff at one time as a package. Plaintiff was given written notice of the particulars of what loss was being pursued.
The same conclusion cannot be reached as to the sufficiency of the notice of the reasonable suspicion of plaintiff’s involvement. The investigation memorandum, under "reasonable suspicion”, stated only, "You were present on Dec. 7, 1990 when the wire transfér was sent. You had access to all necessary documents and stamps to create item and place it in basket for transmission.” There is no doubt that that statement is grossly inadequate under the EPPA. The regulations amplify the Act and specify that the statement provide "A description in detail of the basis of the employer’s reasonable suspicion that the employee was involved” (29 CFR 801.12 [a] [4] [iii] [emphasis added]). Here the substance of the written statement is only that plaintiff has access. But access alone is not reasonable suspicion, absent the unusual circumstances not present here where only one employee had access. "Access in the sense of possible or potential opportunity, standing alone, does not constitute a basis for 'reasonable suspicion’ ” (29 CFR 801.12 [f] [1]).
Citibank does not seriously contend that the investigation memorandum provides the particularized statement of reasonable suspicion required in the notice.[7] Rather it asserts that during the course of the extensive interview its officials had with plaintiff he was made aware of all of the facts possessed by Citibank in reaching their conclusion that they had reasonable suspicion that he was involved. In essence Citibank is arguing for a rule that would permit substantial compliance with the requirements of a written statement. The court finds that the law is to the contrary. Literal compliance with the provisions of 29 USC § 2006 (d) is required to take an employer out of the basic prohibition on using polygraphs provided in the EPPA. For example, in Lyle v Mercy Hosp. Anderson (876 F *262 Supp 157, 161 [SD Ohio 1995]) the court found an absence of the required statement. A defendant "may only claim the ongoing investigation exemption by demonstrating that it meets all the elements of the exemption, including the procedural elements listed in § 2006 (d)(4). Mercy Hospital’s failure to do so is fatal to its claimed exemption” (supra, at 162).
This court concludes that the Act and regulations are unmistakable in their requirement that the written statement given an employee itself, regardless of oral amplification, must provide a particularized basis for the employer’s conclusion that there is reasonable suspicion. A written notice permits the employee meaningfully to consult with counsel or other advisors in determining whether to take a requested polygraph test (see, 29 CFR 801.12 [g] [2]). A writing provides an objective basis for the Department of Labor or others reviewing the conduct of the parties, without resort to the difficulties of reconstructing oral communications. The requirement of particularized written statements obviously cannot be met by an oral notice alone. Citibank seeks to water down the statute by its reliance on the oral interrogation and the information that plaintiff is supposed to have gleaned from it. Its argument is analogous to a claim that the employer could restructure a defective notice because plaintiff allegedly knew through the office "grapevine” the reasons why he was the subject of the investigation. Congress insisted on written statements that contain certain information as a "minimum” when employers are to rely on the "ongoing investigation” exemption. This is in sharp contrast to the exception under the Act for companies involved in the manufacture, distribution and dispensing of controlled substances; that exemption does not require any written statement of reasonable suspicion, mere employee access is sufficient (29 USC § 2006 [f] [2]; 29 CFR 801.13 [e]). Two Federal ALJs have held that "oral notification of an impending polygraph examination that otherwise discloses the required information has no legal relevance under the Act” (Matter of State Empls. Credit Union, 93-EPP-9, ALJ Dec, Feb. 4, 1994 slip op, at 12; Matter of Rapid Roberts, 91-EPP-4, ALJ Dec, June 18, 1992 slip op, at 15, 21, affd Secretary of Labor Dec, supra, at 5). This court agrees.
The court concludes that Citibank has failed to establish its right to rely on the "ongoing investigation” exemption under the EPPA because it failed to comply with section 7 (d) (4) of the Act. Accordingly Citibank’s request that plaintiff take a polygraph test is in violation of EPPA § 3 (29 USC § 2002 [1]). *263 Citibank’s suspension and termination of plaintiff were barred by EPPA § 3 (29 USC § 2002 [3]) unless Citibank can prove at trial that plaintiff’s failure to take the polygraph test played no part in the decision either to suspend or fire him. "[R]efusal to take a polygraph test may not serve as a basis for adverse employment action, even with additional supporting evidence, unless the employer observes all the requirements of sections 7(d) and 8(b) of the Act” (29 CFR 801.20 [c]). Under the traditional New York rule an employee at will may be terminated for any reason (Murphy v American Home Prods. Corp., 58 NY2d 293, 304-305), including failure to take a polygraph test (Aikman v Dean Witter Reynolds, 153 AD2d 475, 476). However, the EPPA, through the Supremacy Clause, clearly has superseded that rule with respect to terminations based on prohibited threatened or taken polygraph tests (see, Aikman v Dean Witter Reynolds, supra).
Citibank’s motion for summary judgment is denied in all respects. Plaintiff’s cross motion for summary judgment is granted to the extent indicated.

. As defined in the EPPA
"The term 'polygraph’ means an instrument that—
"(A) records continuously, visually, permanently, and simultaneously changes in cardiovascular, respiratory, and electrodermal patterns as minimum instrumentation standards; and
"(B) is used, or the results of which are used, for the purpose of rendering a diagnostic opinion regarding the honesty or dishonesty of an individual” (29 USC § 2001 [4]; EPPA § 2 [4]).
A "lie detector” is a "polygraph, deceptograph, voice stress analyzer, psychological stress evaluator, or any other similar device (whether mechanical or electrical) that is used, or the results of which are used, for the purpose of rendering a diagnostic opinion regarding the honesty or dishonesty of an individual” (29 USC § 2001 [3]; EPPA § 2 [3]).

. The Senate report on the EPPA noted that "probably between 100,000 and 300,000 fewer individuals will be wrongfully denied employment opportunities solely due to the inaccuracy of the testing procedures” (S Rep No. 284, 100th Cong, 2d Sess 41, 50, reprinted in 1988 US Code Cong & Admin News 728, 738).

. Counsel for both sides failed to bring to this court’s attention any prior decisions by any court or agency.

. The EPPA provides that the Secretary of Labor shall adopt regulations under the Act, conduct investigations, impose civil penalties and bring injunctive actions, including actions for lost wages and benefits (29 USC §§ 2004, 2005 [a], [b]; EPPA §§ 5, 6 [a], [b]). There are several decisions by ALJs (Administrative Law Judges) and the Secretary of Labor dealing with the EPPA that are not generally available except using the Department of Labor web page on the Internet. The regulations are at 29 CFR 801.1 et seq.

. The conclusion of the New York Regional Office of the Department of Labor in 1993 is, of course, not binding in light of the subsequent holdings of the Secretary of Labor in the litigated cases discussed below.

. Although it is irrelevant to the issues on this motion, Citibank notes that plaintiff was indicted by a Federal Grand Jury for his involvement in the fraud. Plaintiff was acquitted after a jury trial.

. Indeed in its response to the Department of Labor investigation of plaintiff’s complaint Citibank wrote "the basis of the reasonable suspicion may not be clearly defined in each Memorandum”.